IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Jackie's Restaurant, LLC,<br>    **Plaintiff,**<br>        v.<br>Plaza Carolina Mall, L.P.,<br>    **Defendant,**<br><br>Plaza Carolina Mall, L.P.,<br>    **Counter Claimant,**<br>        v.<br>Jackie's Restaurant, LLC,<br>    **Counter Defendant.** | **CIVIL NO. 17-2376 (RAM)** |

<u>OPINION AND ORDER</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court are Defendant Plaza Carolina Mall, L.P.'s *Motion for Summary Judgment and* Plaintiff Jackie's Restaurant, LLC's *Motion for Summary Judgment* as well as the parties' submissions in support and opposition thereto. (Dockets Nos. 34-36, 32 and 49). Having considered the parties' submissions, the *Motion for Summary Judgment* at Docket No. 34 is **GRANTED** in part and **DENIED** in part, the *Motion for Summary Judgment* at Docket No. 35 is **GRANTED** in part and **DENIED** in part.

I.   **PROCEDURAL BACKGROUND AND INTRODUCTION**

Plaintiff Jackie's Restaurant, LLC's ("Plaintiff" or "Jackie's") *Complaint*, filed on December 19, 2017, posits that Jackie's could resolve the Lease Agreement ("Lease" or "Agreement") executed with Defendant Plaza Carolina Mall, L.P. ("Defendant" or "PCM") on September 4, 2012. (Docket Nos. 8-1 at

8-12). It avers it is owed the return of its security deposit and unused September 2017 rent.[1] Plaintiff also asks the Court to: (1) declare Jackie's the fee simple owner of the equipment inside the leased premises[2] and PCM lacks a right to said equipment; and (2) order PCM to pay fourteen thousand dollars ($14,000.00) if Jackie's loses potential offers to buy the same. Lastly, Jackie's requests that the Court order PCM to pay the lawsuit's costs and ten thousand dollars ($10,000.00) in attorney's fees. Id. at 13-19.

On September 28, 2018, PCM filed a *Motion for Summary Judgment* ("PCM's MSJ") and its statement of uncontested material facts ("PCM's SUMF"). (Docket Nos. 34 and 34-2). PCM alleges that the declaratory judgment requested by Jackie's should be denied; that Jackie's cannot terminate the Lease under both its terms and conditions and the Puerto Rico Civil Code; that Jackie's cannot justify the application of the *Rebus Sic Stantibus* doctrine; and that PCM has a right to the equipment Jackie's left behind when it abandoned the Premises. (Docket No. 34 at 14-28). Plaintiff subsequently filed *Jackie's Opposition to Plaza Carolina's Motion for Summary Judgment* (Docket No. 36) countered by *Defendant's Reply*

---

[1] PCM removed this case to federal court on December 22, 2017. (Docket No. 1; certified English translation at Docket No. 8-1).

[2] See Fee Simple, Black's Law Dictionary (11th ed. 2019) ("An interest in land [or property] that, being the broadest property interest allowed by law, endures until the current holder dies without heirs.")

to Jackie's Opposition for Motion for Summary Judgment. (Docket No. 42).

On October 15, 2018, Jackie's filed a *Motion for Summary Judgment* ("Plaintiff's MSJ") and its statement of uncontested material facts ("Plaintiff's SUMF"). (Docket Nos. 35 and 35-28). Jackie's alleges that it could terminate the Agreement pursuant to Article 1077 of Puerto Rico's Civil Code because PCM failed to fulfill its essential duty of maintaining the mall and common areas open to the public after the passing of Hurricane María in September 2017. (Docket No. 35 at 12-13). Thus, Jackie's contends it is entitled to the security deposit, the unused September 2017 rent and fourteen thousand dollars ($14,000) for the equipment PCM allegedly seized from Plaintiff. Id. at 20-23. Jackie's also avers that the Court should impose attorney's fees upon PCM for its obstinate behavior. Id. at 23-24. PCM then filed *Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment*. (Docket No. 39). Lastly, on November 15, 2018, PCM filed a *Motion to Strike Hui Yu Ye's Declaration at 35-24* ("*Motion to Strike*"). (Docket No. 38). The *Motion to Strike* was addressed in a separate Opinion and Order at Docket No. 59.

For reasons set forth below, the Court determines that Jackie's did not have legally sufficient cause to terminate the Lease Agreement with PCM prior to its expiration date. However, while PCM prevails herein on its breach of contract claims, it

cannot keep Jackie's Restaurant LLC's equipment because it lacks a perfected security interest.

The case will proceed to trial on the remaining issues which are: (a) the amount of damages, if any, that PCM can recover due to Jackie's breach of contract; (b) the amount of damages Jackie's can recover, if any, due to PCM's retention of the equipment without a perfected security interest; and (c) any credits due to Jackie's which may offset any damages awarded to PCM.

## II.   LEGAL STANDARD

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for summary judgment." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The movant "bears the burden of showing the absence of a genuine issue of material fact." United States Dep't of Agric. v. Morales-Quinones, 2020 WL 1126165, at *1 (D.P.R. 2020) (citation omitted). The burden then shifts to non-movant to present at least one genuine **and** material issue of fact. Id. (quotation omitted).

Summary judgment is proper if non-movants only rely on improbable inferences, conclusory allegations and unsupported speculation. *See* Burke Rozzetti v. Ford Motor Co., 2020 WL 704860, at *3 (D.P.R. 2020) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. Civ. R. 56. Subsection "b" imposes that a moving party submit its factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." L. CV. R. 56(b). Parties cannot incorporate statements of facts within a motion. Also, per local rule, "unless a fact is admitted, the reply shall support each denial or qualification by a record citation." Id. The First Circuit has highlighted that "[p]roperly supported facts [...] shall be **deemed admitted** unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted).

### III. FINDINGS OF FACT

After analyzing PCM's SUMF (Docket No. 34-2), Jackie's SUMF (Docket No. 35-28) and their exhibits and Defendant's additional facts proposed at Docket No. 42, and **only crediting material facts which are supported by a record citation and uncontroverted**, the Court makes the following findings of fact:[3]

---

[3] Reference to a specific Finding of Fact shall be cited as "(Fact ¶ __)."

1. Plaintiff Jackie's Restaurant, LLC ("Jackie's") is a limited liability company organized under the laws of the Commonwealth of Puerto Rico on July 18, 2012. (Docket No. 35-28 ¶ 1).

2. The owners of Jackie's at that time of the signing of the Lease Agreement (the "Agreement") were Hui Yu Ye and Zu Fu Zhang. (Docket No. 34-2 ¶ 4).

3. Defendant Plaza Carolina Mall L.P. ("PCM") is the owner and operator of the shopping center Plaza Carolina Mall (the "Mall"), located in the Municipality of Carolina, Puerto Rico. (Docket No. 34-2 ¶ 1).

4. Defendant is a limited partnership organized under the laws of the state of Delaware, United States of America, and is the owner of the Mall. (Docket No. 35-28 ¶ 2).

5. As the Mall's owner, it leases commercial space within its premises to a variety of businesses. (Docket No. 34-2 ¶ 2).

Lease Agreement

6. On September 4, 2012, PCM, as the lessor and landlord, leased to Jackie's Restaurant Inc. a commercial space of 808 square feet, located at the Mall Food Court, which is identified for purposes of the Agreement as Commercial Space No. VC21A. (Docket Nos. 34-2 ¶ 3; 35-28 ¶ 3).

7. The Agreement signed by Jackie's on September 4, 2012, has a term of ten (10) years, ending on September 30, 2022. (Docket Nos. 34-2 ¶¶ 7, 10; 35-28 ¶ 6).

8. Neither owner of Jackie's read the Agreement. (Docket No. 34-2 ¶ 5).

9. Neither owner consulted an attorney regarding the Agreement before they signed it. Id. ¶ 6.

10. After 2013 until the present day, the sole member of Jackie's was Hui Yu Ye. Id. ¶ 12.

11. Jackie's sole Member agrees that Jackie's is bound by the Agreement's terms and conditions. Id. ¶ 13.

12. In the Agreement, PCM agreed to provide Jackie's: (a) the enjoyment and the use of the leased area of 808 square feet in the Food Court (Room VC21A); and, (b) the non-exclusive right to Jackie's and its customers to use the Common Areas, which are defined as:

> "[a]ll parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Center, including employee parking areas, truck ways, driveways, loading docks and areas, delivery areas, multi-story parking facilities (if any), package pickup stations, elevators, escalators, pedestrian sidewalks, malls, including the enclosed mall and Food Court, if any, courts and ramps, landscaped areas, retaining walls, stairways, bus stops, first-aid and comfort stations, lighting facilities, sanitary systems, utility lines, water filtration and treatment facilities and other areas and improvements provided by Landlord for the general use in common of tenants and their customers and Major Tenants in the Center[.]" (Docket No. 35-28 ¶ 4).

13. Section 1.1 of the Agreement, which establishes the basic lease information including the Center, Premise, Store Floor Area and Lease Term, reads as follows:

    a. Center: Plaza Carolina, situated in the City of Carolina, Commonwealth of Puerto Rico

    b. Premises: Room VC21A. Landlord shall have the right to change the room designation upon written notice to Tenant.

    c. Store Floor Area: 808 square feet

    d. Lease Term: Commencing on the Commencement Date and continuing until the last day of the tenth (10th) Lease Year. (Docket No. 35-2 at 1).

14. Section 2.1 of the Agreement titled "Leased Premises," reads as follows:

> Landlord [PCM] hereby leases to Tenant [Jackie's] and Tenant hereby rents from Landlord the Premises as depicted on 'Exhibit A. The Store Floor shall be measured to the center line of all party off adjacent tenant walls, to the exterior faces of all other walls and to the building line where there is no wall. The parties agree that Landlord's determination of Store Floor Area shall be final, binding and conclusive. Id. at 3.

15. Section 5.1 of the Agreement titled "Common Areas," and which addresses control over and changes to the common areas, explains that common areas:

> [S]hall at all times be subject to the exclusive control and management of the Landlord, and Landlord shall the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to all Common Areas.
>
> […]
>
> Landlord shall have the right from time to time: to change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas […] add to or subtract from the buildings in the Center; and do and perform such other acts in and

to said Common Areas as Landlord in its sole discretion, reasonably applied, deems advisable for the use thereof by tenants and their customers. Id. at 7.

16. Section 5.2 of the Agreement, titled "Use of Common Area" and which addresses the temporary closure of common areas states the following:

> Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Areas subject to such reasonable regulations as Landlord may from time to time impose and the rights of Landlord set forth above. […] Landlord may at any time close temporarily any Common Areas to make repairs or changes. Id.

17. As part of the Agreement, PCM requires that its tenants, among other things, open their businesses during the Mall's hours of operation or when any Major Tenant in the Center is open for business and such other days, nights and hours as Landlord shall approve in writing; pay a proportional share of the operating expenses, taxes, and marketing services; and pay a share of its gross profit. Id. ¶ 54.

18. The basic rental payments agreed to by Jackie's for the 808-square feet leased area, as stated in the Agreement, are as follows:

   a. Annual rent of $75,000.00, for the first year of the Agreement, payable in equal monthly installments;

   b. Annual rent of $77,250.00, for the second year of the Agreement, payable in equal monthly installments;

   c. Annual rent of $79,567.50, for the third year of the

Agreement, payable in equal monthly installments;

d. Annual rent of $81,954.52, for the fourth year of the Agreement, payable in equal monthly installments;

e. Annual rent of $84,413.16, for the fifth year of the Agreement, payable in equal monthly installments;

f. Annual rent of $86,945.56, for the sixth year of the Agreement, payable in equal monthly installments;

g. Annual rent of $89,553.92, for the seventh year of the Agreement, payable in equal monthly installments;

h. Annual rent of $92,240.54, for the eighth year of the Agreement, payable in equal monthly installments;

i. Annual rent of $95,007.76, for the ninth year of the Agreement, payable in equal monthly installments; and

j. Annual rent of $97,857.99, for the tenth year of the Agreement, payable in equal monthly installments; (Docket Nos. 34-2 ¶ 8; 35-28 ¶6).

19. Section 15.1 of the Agreement establishes in part:

"Amount of Deposit. Tenant shall deposit with Landlord upon Tenant's execution of the Lease, the Security Deposit set forth in Article I, which shall be held by Landlord and, at Landlord's option, commingled with other funds, without liability for interest, as security for the faithful performance by Tenant of all the terms, covenants and conditions of this Lease.

If Tenant commits a default hereunder, Landlord at its option may apply said deposit, or any part thereof, to compensate Landlord for loss, cost, damage or expense sustained due to such default. Upon Landlord's request, Tenant shall forthwith remit to Landlord cash sufficient to restore said sum to the original sum deposited; Tenant's failure to do so within five (5) days after receipt of demand therefor (sic) shall be a default under this Lease. If at the end of the Lease Term Tenant is not in default hereunder, the balance of such security deposit shall be returned to Tenant. (Docket No. 35-28 ¶74).

20. Jackie's Members not only signed the Agreement, but also initialed
    the pages with the above paragraph. (Docket No. 34-2 ¶ 48).

21. On October 9, 2012, there was an Assignment of Lease to correct
    the name of Plaintiff in the Agreement, which was incorrectly
    stated as Jackie´s Restaurant, Inc., instead of Jackie's
    Restaurant, LLC. (Docket Nos. 34-2 ¶ 11; 35-28 ¶ 5).

22. The Agreement between the parties began to run in March 2013.
    (Docket No. 34-2 ¶ 9).

23. On February 20, 2017, Jackie's, through Hui Yu Ye, in a First
    Amendment to the Lease Agreement, requested a reduction in rent,
    corresponding to the period from January 1 to December 31, 2017,
    would be $96,137.76, plus 12% of the gross annual sales over
    $550,000.00 in that period while in the Agreement, the rent
    stipulated for said period was $84,413.16 per year and 8% of the
    sales over $1,055.164.51. (Docket Nos. 34-2 ¶ 14; 35-28 ¶ 9).

24. The Agreement, Assignment of Lease and First Amendment to Lease
    were drafted by Defendant. (Docket No. 35-28 ¶ 10).

25. Plaintiff complied with its obligations to pay the security deposit
    of $43,160.00 and the monthly rent for five (5) years (including
    the payment of September 2017) until Hurricane María. In addition,
    during that period, Plaintiff paid to PCM: (a) an amount equivalent
    to 8% of the gross annual sales over the amounts established in
    Section 1.1 (i) of the Agreement; (b) taxes as calculated in Section

5.4; (c) its share of the operating costs (Section 6.2) and operating expense fees (Section 1.1 (k); and (d) a marketing service contribution (Section 1.1 (n)). Id. ¶¶ 7 and 11.

### PCM and Hurricanes Irma and María

26. Plaintiff paid its September 2017 monthly rent on time, but it was only able to operate its restaurant for 18 days because the Mall was closed to the public due to Hurricanes Irma and María. Id. ¶ 12.

27. Since 2012, the year that the Agreement was signed, 39 hurricanes have passed through the Caribbean area, some going through Puerto Rico. (Docket No. 34-2 ¶ 18).[4]

28. Hurricane Irma passed through Puerto Rico on September 6, 2017. Id. ¶ 19.[5]

29. Hurricane Maria passed through Puerto Rico on September 18, 2017. Id. ¶ 20.[6]

30. After Hurricane María, there was no water or electric power in the Mall until around November 2017. (Docket No. 35-28 ¶ 13).

---

[4] PCM cited Exhibit "F" (Docket No. 34-9) instead of Exhibit "E." (Docket No. 34-8). Even so, Exhibit "E", which are statements from the National Hurricane Center's 2012-2017 Tropical Cyclone Reports, is subject to judicial notice. *See* Are-east River Sci. Park, LLC v. Lexington Ins. Co., 2014 WL 12587051, at *5 (C.D. Cal. 2014) (quotation omitted) ("The National Hurricane Center […] is a source 'whose accuracy cannot be reasonably questioned' of weather and meteorological facts concerning tropical cyclones.").

[5] Id.

[6] Id.; PCM stated the incorrect date for when Hurricane Maria passed through Puerto Rico. The Court takes judicial notice of the correct date, September 20, 2017. *See* Fed. R. Evid. 201(b). Plaintiff's Exhibit "A", of which the Court also takes judicial notice, shows the National Oceanic and Atmospheric Administration's map of the Hurricane's path and said date. (Docket No. 37-1).

31. The space where Jackie's is located did not suffer any damages. (Docket No. 34-2 ¶ 42).

   PCM Tenants Post-Hurricane Maria

32. The space leased by Jackie's was physically available for Tenant to re-open on or before December 1, 2017. (Docket No. 34-2 ¶ 38).

33. Other food court tenants have reopened for business. Id. ¶ 39.

34. After Hurricane María, Ms. Hui Yu Ye, Plaintiff's managing member, went to the Mall a couple of times to ask when it would be open to the public again but she never got an answer. (Docket No. 35-28 ¶ 14).

35. Around November 8, 2017, PCM informed the tenants with restaurants in the Food Court that they had to resume operations the following week, while only a few stores were open, and the rest of the Mall would remain closed to the public while major repairs were made. Id. ¶ 15.

36. On Wednesday, November 15, 2017, PCM, through Mr. Drew Price, Esq., emailed Jackie's that "Landlord and the shopping center tenants are working in earnest to reopen the shopping center and tenant spaces. [...] [T]he food court will be opening this week." Id. ¶¶ 22, 37.

37. At the filing of the Complaint before the state court on December 19, 2017, only some tenants with restaurants in the Food Court had reopened. (Docket 35-28 ¶ 30).

38. At the filing of the Complaint before the state court, the public

did not have access to the Mall's interior corridors and common
areas. The goal was to have the common areas open by February 2018.
Id. ¶ 32.

39. At the filing of the Complaint before state court, Sears, Capri and
    TJMax stores were open. These stores do not need to be accessed by
    the Mall's interior corridors and common areas; they can be accessed
    from outside the Mall. Id. ¶ 33.

40. At the filing of the Complaint before state court, Walgreens and
    Econo Supermarket were open. Their buildings are totally separate
    from the Mall's main building. Id. ¶ 34.

41. In November 2017, when Plaintiff inquired with the Mall's personnel
    about the date it was planning on resuming operations, the Mall did
    not have a date. Id. ¶ 36.

42. On December 7, 2017, Plaintiff's managing member visited the Mall
    and took several photos. Id. ¶ 38.

43. By December 7, 2017, the Mall had containers outside for the removal
    of the debris and cleaning. Id. ¶ 39.

44. By December 7, 2017, the Mall was almost deserted with only a few
    stores open, the first and third floor of the Mall were closed,
    and the public did not have access to the corridors inside the
    Mall, which were closed in on all sides. Id. ¶ 40.

45. By December 2017, the common areas of the mall had begun to reopen.
    (Docket No. 42 at 2).

46. By December 7, 2017, approximately 22 tenants had reopened as

required by their leases. Id. at 3.

47. As of April 17, 2018, the Mall's internet portal shows 12 restaurants open and 8 closed in the **Food Court** and 13 food stores were open and 13 closed in the Mall **in general**. (Docket No. 35-28 ¶ 42-43).[7]

48. Last time managing member visited the Mall was May 2018, when she took some photos and did a tour of the first, second and third floor, up to the food court. At the time, most of the shops were still under construction or closed, while a couple were open. Id. ¶¶ 44, 47.

49. On May 8, 2018, there were only around 7-8 stores open in the food court. Id. ¶ 49.

50. As of October 15, 2018, when Plaintiff filed its Motion for Summary Judgment, the Mall had not resumed its regular operations for the public. Id. ¶ 59.

51. By June 1, 2018, approximately 94 tenants had reopened as required by their leases. Id. at 3.

52. While construction by Tenants was still on going, over 120 Tenants had reopened by October 1, 2018. Id. at 3.

Plaintiff's Notice of Termination and Defendant's Response

53. On November 8, 2017, Plaintiff gave notice purporting to terminate the Agreement, and left the premises object of the Agreement. Id. ¶ 21.

---

[7] Plaintiff's "Exhibit 17B – Plaza Carolinas Stores Directory April 2018" shows that seven (7) restaurants were closed instead of eight (8). (Docket No. 19).

Civil No. 17-2376 (RAM)                                              16

54. On November 8, 2017, Plaintiff's counsel emailed a letter to PCM
    terminating the Agreement and explaining some of the main reasons
    for the decision. (Docket No. 35-28 ¶ 16).

55. In the letter, Plaintiff's counsel asked PCM to reimburse the
    security deposit plus the unused rent of September 2017, which had
    been paid in advance. The reimbursement amount totals to $46,364.60,
    calculated as follows:

| Security Deposit | | $43,160.00 |
|---|---|---|
| | | |
| Unused portion of the rent | $8,011.48 – 4,806.88* | $3,204.60 |
| | *$8,011.48 ÷ 30 days = | |
| | $267.049 x 18 days of | |
| | | |
| Total | | **$46,364.60** |

Id. ¶ 17.

56. Plaintiff's counsel therein invited PCM to a negotiation regarding
    a possible settlement. Id. ¶ 18

Attempts to Remove Plaintiff's Restaurant Equipment

57. On November 15, 2017, Plaintiff sent an email to Mr. Drew Price,
    Esq., asking him to instruct the Mall personnel to allow Plaintiff
    to remove the equipment in the restaurant, which is Plaintiff's
    personal property, and informing him that retaining and prohibiting
    the removal of the equipment constituted an illegal seizure.
    Plaintiff again invited Defendant to a negotiation regarding the

possibility of a settlement. Id. ¶ 23.

58. On Friday, November 17, 2017, PCM, through Mr. Wade J. Hornbacher,
Esq., sent an email to Plaintiff asking it to specify the equipment
it wanted to remove. Id. ¶ 24.

59. On Monday, November 20, 2017, PCM sent an email to Jackie's
reiterating its prohibition against the removal of equipment from
the restaurant. It based its position on its construction of Section
10.2 of the Agreement, which states:

> Section 10.2. Removal and Restoration by Tenant.
> All alterations, changes and additions and all
> improvements, including leasehold improvements, made by
> Tenant whether part of Tenant's Work or not, shall
> immediately upon installation attached to the fee and
> become Landlord's property and shall not be removed
> unless replaced by like property. If Tenant fails to
> remove any shelving, decorations, equipment, trade
> fixtures or personal property form the Premises prior to
> the end of the Lease Term, they shall become Landlord's
> property and Tenant shall repair or pay for the repair
> of any damage done to the Premises resulting from
> removing same but not for painting or redecorating the
> Premises. Id. ¶ 25.

60. On Wednesday, November 14, 2017, Ms. Hui Yu Ye, as Plaintiff's
managing partner, went to the Mall to coordinate the pickup of the
equipment. That day, the Mall's managerial personnel informed her
that she could not remove the equipment and that the security staff
had instructions not to allow the removal thereof. They also told
her that PCM was planning on reopening the Food Court at the end
of the following week and required that Plaintiff reopen the
restaurant that week, even though the rest of the shopping center

would remain closed to the public. Id. ¶ 21.

61. In compliance with PCM's request, on November 20, 2017, Plaintiff sent an email to Mr. Hornbacher detailing the equipment it wanted to remove. Id. ¶ 26.

62. On November 27, 2017, Plaintiff sent an email to Mr. Hornbacher reiterating that it needed to remove the equipment urgently because it had interested buyers. It once again invited Defendant to a negotiation regarding the possibility of a settlement. Id. ¶ 27.

63. On November 28, 2017, PCM sent an email to Plaintiff forbidding it from removing the equipment. It again based its position on its construction of Section 10.2 of the Agreement. Defendant did not make any counteroffer to negotiate. Id. ¶ 28.

64. Plaintiff had several offers to purchase the equipment for an approximate price of $14,000.00 but could accept the offers due to PCM's refusal to allow the removal of the equipment or f a i l u r e to deliver the equipment to Plaintiff. Id. ¶ 66.

65. Even though Plaintiff informed PCM that it had several offers to purchase the equipment, PCM did not allow Plaintiff to remove or deliver said equipment. Id. ¶¶ 64-65.

Defendant's Security Interest Over Equipment

66. In its Counterclaim, PCM claims a proprietary interest in Plaintiff's personal property and equipment, by citing Section 18.1 of the Agreement. Id. ¶ 68.

67. In its Counterclaim, PCM avers to be "…entitled to enforce its

security interest as provided by tenant in paragraph 20.2 of the Lease...." Id. ¶ 70.

68. Said Section 20.2 of the Agreement states:

> Section 20.2. Assets of Tenant.
> To secure the performance of Tenant's obligations under this Lease, Tenant hereby grants to Landlord a security interest in and an express contractual lien upon all of Tenant's equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property which will be brought upon the Premises by Tenant, and all after-acquired property, replacements and proceeds. Landlord is authorized to prepare and file financing statements signed only by Landlord (as secured party) covering the security described above (but Tenant hereby agrees to sign the same upon request). Upon any default under this Lease by Tenant as defined in Section 18.1 hereof, any or all of Tenant's obligations to Landlord secured hereby shall, at Landlord's option, be immediately due and payable without notice or demand. In addition to all rights or remedies of Landlord under this Lease and the law, including the right to a judicial foreclosure, Landlord shall have all the rights and remedies of a secured party under the Uniform Commercial Code of the State where the Center is located. […] This security agreement and the security interest hereby created shall survive the termination of this Lease if such termination results from Tenant's default. The above-described security interest and lien are in addition to and cumulative of the Landlord's lien provided by the laws of the State where the Center is located. Id. ¶ 71.

69. In its Answer to Counterclaim, Plaintiff denied that PCM has a security interest in its equipment and property, because it did not file a financing statement, as required by Section 9-312 (a) of Chapter 9-Secured Transactions, 19 L.P.R.A. § 2321 (a) (3) and § 2262 (a). Id. ¶ 72.

70. PCM did not perfect a security interest over Jackie's equipment

and inventory, because a financing statement was not recorded in

Puerto Rico's Department of State. Id. ¶ 73.

Plaintiff's Overdue Rent and Abandonment of Premises

71. PCM abated Jackie's rent from the date of Hurricane María though

December 1, 2017. (Docket No. 34-2 ¶ 22).

72. Jackie's owes rent from December 1, 2017 through November 30, 2022,

the date when the Agreement expires. Id. ¶ 23.

73. PCM has not collected any rent from Jackie's since the passage of

Hurricane María to the present day. Id. ¶ 43.

74. According to the Agreement, Jackie's agreed and obligated itself

to pay rents for the remainder of the term of the Agreement (plus

interest, costs and penalties), even if it had to leave the

property before the expiration of the term of the Agreement. Id.

¶ 24.

75. Section 18.1 of the Agreement states:

> Section 18.1. Right to Re-Enter.
> The following shall be considered for all purposes to
> be defaults under and breaches of this Lease: (a) any
> failure of Tenant to pay any rent or other amount when
> due hereunder, (b) any failure by Tenant to perform or
> observe any other of the terms, provisions, conditions
> and covenants of this Lease for more than ten (10) days
> after written notice of such failure […] (f) if Tenant
> abandons or vacates or does not do business in the
> Premises[.]
>
> […]
>
> In any such event, and without grace period, demand or
> notice (the same being hereby waived by Tenant),
> Landlord, in addition to all other rights or remedies
> it may have, shall have the right thereupon or at any

time thereafter to terminate this Lease by giving notice
to Tenant stating the date upon which such termination
shall be effective, and shall have the right, either
before or after any such termination, to re-enter and
take possession of the Premises, remove all persons and
property from the Premises, store such property at
Tenant's expense, and sell such property if necessary to
satisfy any deficiency in payments by Tenant as required
hereunder, all without notice or resort to legal process
and without being deemed guilty of trespass or becoming
liable for any loss or damage occasioned thereby. Nothing
herein shall be construed to require Landlord to give
any notice before exercising any of its rights and
remedies provided for in Section 3.3 of this Lease.
(Docket Nos. 34-2 ¶25; 35-28 ¶ 69).

76. Section 18.2 of the Agreement states in part:

Section 18.2. Right to Relet.
    If Landlord re-enters the Premises as above provided,
or if it takes possession pursuant to legal proceedings
or otherwise, it may either terminate this Lease, but
Tenant shall remain liable for all obligations arising
during the balance of the original stated term as
hereafter provided as if this Lease had remained in full
force and effect, or it may, from time to time, without
terminating this Lease, make such alterations and
repairs as it deems advisable to relet the Premises[.]

[…]

    Notwithstanding any such reletting without
termination, Landlord may at any time thereafter
terminate this Lease for any prior breach or default. If
Landlord terminates this Lease for any breach, or
otherwise takes any action on account of Tenant's breach
or default hereunder, in addition to any other remedies
it may have, it may recover from Tenant all damages
incurred by reason of such breach or default, including
the cost of recovering the Premises, brokerage fees and
expenses of placing the Premises in rentable condition,
attorneys' fees, and an amount equal to the difference
between the Minimum Rent and all items of additional
rents reserved hereunder for the period which otherwise
would have constituted the balance of the Lease Term
and the then present rental value of the Premises for such

period.

[…]

Tenant's obligation to reimburse Landlord for
attorneys' fees as referred to in this Lease shall
include all legal costs, fees and expenses arising out
of (i) Tenant's default in the performance or observance
of any of the terms, covenants, conditions contained in
this Lease and Landlord place (sic) the enforcement of
all or any part of this Lease, the collection of any
rent due or to become due or the recovery of possession
of the Premises in the hands of an attorney or Landlord's
incurring any fees or out of pocket costs in any
litigation, negotiation or transaction in which Tenant
causes Landlord to be involved or concerned, in either
event regardless of whether or not suit is actually
filed. (Docket No. 34-2 ¶ 26).

77. Section 24.3 of the Agreement is the integration clause and it

states in relevant part as follows:

Section 24.3. Entire Agreement.
There are no representations, covenants,
warranties, promises, agreements, conditions or
undertakings, oral or written, between Landlord and
Tenant other than herein set forth. Except as herein
otherwise provided, no subsequent alteration, amendment,
change or addition to this Lease shall be binding upon
Landlord or Tenant unless in writing and signed by them.
Tenant acknowledges that it has independently
investigated the potential for the success of its
operations in the Center and has not relied upon any
inducements or representations on the part of Landlord
or Landlord's representatives, other than those
contained in the Lease. Tenant also acknowledges and
agrees that, to the extent any projections, materials or
discussions have related to Tenant's projected or likely
sales volume, customer traffic or profitability, Tenant
understands that any and all such projections, materials
and discussions are based solely upon Landlord's
experiences at other properties or upon standardized
marketing studies, and that such projections, materials
and discussions shall not be construed as a promise or

guarantee that Tenant will realize the same or similar results. Id. ¶ 35.

78. Jackie's ceased operations on the property that is the subject of the Agreement on September 18, 2017, before the Agreement expired. Id. ¶¶ 27, 29 and 41.

79. Jackie's never notified PCM any change of address after Hurricane María. Id. ¶ 28.

80. Ms. Yu Ye's Deposition supports a finding that Jackie's abandoned the Premises. The relevant part of the Deposition states:

> Q. Okay. In your response to Request for Admissions 13 you deny that Jackie's abandoned the property subject of the lease agreement, right?
>
> THE INTERPRETER:[8] She denied that--
>
> Q. That Jackie's Restaurant abandoned the property subject of the lease agreement.
>
> THE INTERPRETER: Yes. She doesn't want to do it anymore.
>
> […]
>
> THE INTERPRETER: She doesn't want to work anymore. She doesn't want to go with the lease.
>
> […]
>
> THE INTERPRETER: That they're taking too long to get notified and that she doesn't have the money to be constantly paying.
>
> Mr. SURIA: So she left? I mean, "she," meaning Jackie's Restaurant."

---

[8] During the Deposition, Plaintiff's answers were translated via an interpreter as Plaintiff's first language is Chinese and she only speaks a little bit of English and Spanish. (Docket No. 35-24 at 10-11). Hence, this Court will consider the Interpreter's answers to PCM's legal counsel's questions as Plaintiff's own answers.

THE INTERPRETER: Yeah. (Docket No. 35-24 at 107-109).

### III. ANALYSIS

Both parties move for summary judgment, addressing essentially similar issues regarding the circumstances surrounding the Lease's termination, and whether either party has a right to the restaurant equipment inside the leased premises. (Docket Nos. 34 and 35). Rather than approach each motion separately, the Court will evaluate two issues: (a) whether Jackie's could resolve its contract with PCM or if instead it breached it; (b) whether PCM had a security interest over the restaurant equipment in the Premises. The Court finds that **Plaintiff breached the parties' contract and it is not entitled to damages other than those caused by PCM's retention of the restaurant equipment.** Moreover, as Defendant did not acquire a security interest over the equipment in the Premises, **the equipment belongs to Jackie's**.

Before addressing these two issues, the Court observes that in its MSJ, PCM also alleges that Plaintiff's declaratory judgment request regarding the delivery of the restaurant equipment should be denied, and that Plaintiff fails to establish the elements of the *Rebus Sic Stantibus* Doctrine. (Docket No. 34). In its opposition, Jackie's alleges that the denial of the request for declaratory judgment became moot because Jackie's "did not pursue it once the case was removed to the Federal Court, and instead

filed a motion for summary judgment." (Docket No. 36 at 24).
Jackie's avers that PCM's argument regarding the use of *Rebus Sic
Stantibus* also fails since Jackie's never asserted said defense.
Id. at 10-12. Instead, it has always stated that it could rescind
the Lease per Article 1077 of Puerto Rico's Civil Code. Id.
Notably, PCM did not challenge Plaintiff's clarifications in its
reply to the opposition. (Docket No. 42).

        The Court finds that the *Rebus Sic Stantibus* doctrine is
inapplicable. The doctrine "is a clause deemed implicit in
contracts and serves to adjust a debtor's obligation or rescind
the contract when unforeseeable circumstances render strict
compliance with the contract unfair." In re Chase Monarch Int'l
Inc., 581 B.R. 715, 721 (Bankr. D.P.R. 2018), aff'd, 2019 WL
8375999 (D.P.R. 2019). More importantly, "the Puerto Rico Supreme
Court has stated that the *rebus sic stantibus* doctrine may apply
as an **exceptional remedy to extraordinary circumstances**." Id. at
722 (citation omitted) (emphasis added). There are seven elements
which must be present for the doctrine to apply, the first one of
which is that the doctrine is only applicable if an "unforeseeable
event has arisen." Bautista Cayman Asset Co. v. Asociacion de
Miembros de la Policia de Puerto Rico, 2020 WL 119688, at *2
(D.P.R. 2020) (citation omitted). Here, the first element of the
doctrine is not met as the District Court of Puerto Rico, in
affirming the Bankruptcy Court, has held that a hurricane is not

an unforeseen circumstance for purposes of the *Rebus Sic Stantibus* doctrine. In the case of <u>In Re Chase Monarch Int'l Inc.</u>, the Bankrupcty Court for the District of Puerto Rico held that "[a]lthough the events of Hurricane Maria were devastating and unfortunate [. . .] a natural disaster such as this one is not unforeseeable." <u>In re Chase Monarch Int'l Inc.</u>, 2019 WL 8375999, at *4 (D.P.R. 2019), <u>reconsideration denied,</u> 2020 WL 1746030 (D.P.R. 2020). Since Plaintiff fails to surpass the first element, the Court need not discuss herein the rest of the doctrine's elements.

## A. Rescission or Resolution[9]

PCM posits in its MSJ that Jackie's cannot terminate the current leasehold under the Agreement's terms and conditions nor under the Puerto Rico Civil Code. (Docket No. 34 at 16-18). In doing so, PCM relies on Article 1044 of the Civil Code which states that "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in

---

[9] The First Circuit has explained that "rescission" and "rescind" are not synonymous with the 1930 Puerto Rico Civil Code's Article 1077's original Spanish terms ("resolución" and "resolver"). *See* <u>Dopp v. HTP Corp.</u>, 947 F.2d 506, 510 n.4 (1st Cir. 1991) (citations omitted). It therefore has used the terms "resolution," "resolve," and "resolutory" when referring to actions under Article 1077, while noting that nothing turns on the use of one term or the other. <u>Id.</u>; *see also* <u>Castillo-Perez v. Bosques-Cordero</u>, 2011 WL 13233491, at *8 (D.P.R. 2011), <u>report and recommendation adopted,</u> 2011 WL 13233446 (D.P.R. 2011). Hence "[t]o avoid confusion, as well as to be consistent with the principle that in instances of a statute of Spanish origin the Spanish text prevails" this Court "shall use the words 'resolution' and 'resolve' when referring to article 1077." <u>Brisamar, Inc. v. Enright House, Ltd.</u>, 2005 WL 1215796, at *6 (D.P.R. 2005) (quoting <u>Dopp</u>, 947 F.2d at 510 n.4).

accordance with their stipulations." Id. at 16 (citing P.R. Laws
Ann. tit. 31, § 2994). Moreover, Article 1210 and the principle of
*pacta sunt servanda* establish that "[c]ontracts are perfected by
mere consent, and from the time they are binding, not only with
regard to the fulfillment of what has been expressly stipulated,
but also with regard to all the consequences which, according to
their character, are in accordance with good faith, use and law."
Id. (citing P.R. Laws Ann. tit. 31, § 3375). PCM asserts that
Jackie's signed the Lease and that as part of its obligations, it
agreed to pay the lease term balance and damages if it defaulted.
Id. at 17.

Plaintiff states throughout its own MSJ that it could
terminate or resolve the Lease because PCM failed to fulfill an
essential obligation of the contract, namely "**to keep the mall and
its common areas open**, so that the general public could go shopping
and eat in the Food Court where Plaintiff's rented space is
located." (Docket No. 35 at 12). Jackie's seeks redress pursuant
to Article 1077 of the Puerto Rico Civil Code. Id. at 7-13. Said
Article codifies the right "to rescind the [mutual and reciprocal]
obligations" when "one of the obligated persons does not comply
with what is incumbent upon him." P.R. Laws Ann. tit. 31, § 3052.
Further, the prejudiced person may "choose between exacting the
fulfillment of the obligation or its rescission [resolution], with
indemnity for damages and payment of interest in either case." Id.

Not every breach of a contractual obligation leads to a right to resolve a contract under Article 1077. *See* Rojas-Buscaglia v. Taburno-Vasarhelyi, 113 F. Supp. 3d 534, 543 (D.P.R. 2015) (citation omitted). Instead, the "the unmet obligation must be an **essential obligation** or fulfillment of the obligation must constitute the motive that induced the other party to enter into the contract." Dopp v. Pritzker, 38 F.3d 1239, 1243-44 (1st Cir. 1994) (citing Ramirez v. Club Cala de Palmas, 123 P.R. Dec. 339, 347-48 (1989), 23 P.R. Offic. Trans. 311) (emphasis added). The contract's resolution **cannot** be based on the nonfulfillment of an "accessory" or "complementary" obligation which was only "incorporated into the same [the contract] to complete or clarify the contracting parties' stipulations." Id. at 1246 (quotation omitted). This occurs because "[t]he requirement that the unfulfilled obligation be the principal one serves a higher interest" which is to encourage "the fulfillment of contracts, **and that prevents that**, by a lesser breach of contract, **one of the parties may release himself from the obligation, either because he is no longer interested or because the contract does not suit him anymore**." Id. (quotation omitted). Therefore, "Article 1077 is a remedy of last resort, reserved for situations in which a party's breach dissipates the very essence of a contract." Castillo-Perez v. Bosques-Cordero, 2011 WL 13233491, at *8-9 (D.P.R. 2011), report and recommendation adopted, 2011 WL 13233446 (D.P.R.

2011) (quotation omitted). Plaintiff hence contends that "having a restaurant in a mall with its common areas open to the public, was Plaintiff's contract's 'raison d'etre,'" and in its absence "the contract would never have come into being, and thus, should cease to exist." (Docket No. 35 at 13) (quotation omitted).

PCM argues that Jackie's is unable to resolve the contract under Article 1077 because obtaining a non-exclusive right to use the common areas was not Plaintiff's principal motivation in entering into a lease agreement. (Docket Nos. 39 at 12-13; 42 at 4). Instead, the principal motivation was to the lease the 808 square feet space where the restaurant was located. Id. As a result, the nonexclusive right to use the common areas is merely an accessory disposition of the contract. (Docket No. 39 at 13). Defendant centers its argument on the fact that the Lease explicitly grants PCM control and management of the common areas states that common areas. (Docket Nos. 39 at 13; 42 at 6). Lastly, PCM alleges it complied with the Agreement by making all premises available "as soon as it could" after the passing of Hurricanes Irma and María. (Docket No. 39 at 14). Because Defendant never limited Plaintiff's access to the leased area, in fact the space was physically available to reopen on December 1, 2017 (Fact ¶ 32), Jackie's could not resolve the Lease.

The Court finds that the uncontroverted material facts and the controlling law support PCM's position: Jackie's could not

terminate the Lease or resolve it under Article 1077. The Court reaches this conclusion for three main reasons: (1) the Lease defines the Premises solely as the 808 square foot space where the restaurant was located; (2) PCM did not breach an essential obligation of the Agreement as it was within its rights to alter the common areas during the Mall's renovation after Hurricanes Irma and María; and (3) Jackie's abandoned the Premises before the expiration of the Lease thereby breaching it.

First, as explained by the First Circuit "[i]f the terms of the lease are unambiguous, we interpret it according to its plain terms, and '[s]ummary judgment is appropriate when those plain terms unambiguously favor either side.'" Fernandes v. AGAR Supply Co., 687 F.3d 39, 43 (1st Cir. 2012) (quotation omitted)). A look at Sections 1.1(b), 1.1(c) and 1.1(d) of the Agreement reveals that its main objective was to lease the space titled "Room VC21A" with an area of 808 square feet ("Premises" or "Room VC21A") for a period of ten (10) years. (Fact ¶¶ 6-7 and 13).[10] Moreover, Section 2.1 titled "Leased Premises," reads "Landlord [PCM] hereby leases to Tenant [Jackie's] and Tenant hereby rents from Landlord the Premises as depicted on 'Exhibit A.' […] **The parties agree that Landlord's determinations of the Store Floor Area shall be final, binding and conclusive**." (Fact ¶ 14) (emphasis added). The

---

[10] Both Jackie's and PCM filed as exhibit to their MSJs identical copies of the Agreement executed on September 4, 2012. (Docket Nos. 34-4; 35-2). Subsequent references to the same will only cite Docket No. 35-2.

Exhibit "A" in turn **only** includes: 1) a map showing the Premises'
location in relation to the Mall's Second Floor and its Food Court,
and 2) a drawing of the Premises, including its measurements, and
an adjoining space identified as "VC20." (Docket No. 35-2 at 28).
The October 9, 2012 Assignment of Lease ("Assignment") also
supports this finding. (Docket Nos. 34-6 at 1; 35-4 at 1). The
Assignment states "by a Lease dated September 4, 2012 (the "Lease")
[…] Landlord leased to Assignor [Jackie's] **certain premises being
identified in the Lease as Room V21A (the "Premises").** Id. at 1.
Lastly, the First Amendment to the Lease executed on February 20,
2017 also had similar language. (Docket Nos. 34-7; 35-5).

     The plain language of the Lease, its Exhibit A, the
Assignment, and the Amendment to the Lease, all of which Plaintiff
consented to and signed, show that the leased Premises only
includes Plaintiff's internal operating space and not its right to
use the common areas. See Liberty Mut. Ins. Co. v. Selective Ins.
Co. of Am., 346 F. Supp. 3d 753, 759–60 (E.D. Pa. 2018) (holding
that lease agreement intended "premises" to only include the
internal space where tenant carried on its operations and not the
common areas which it only had a non-exclusive right to use); see
also Doe v. Cloverleaf Mall, 829 F. Supp. 866, 871 (S.D. Miss.
1993).

     Second, multiple courts have held that if a Lease authorizes
the temporary closure for repairs of common areas to which tenants

only have a nonexclusive right to use, landlords do not breach any essential obligation if they temporarily close common areas. *See* Pharmacy 101 Ltd. v. AMB Prop., LP, 2006 WL 1663821, at *4 (E.D. La. 2006) (holding that Plaintiff's non-exclusive use of common areas "does not trump the lease provisions that allow Defendant to impose the parking restrictions" and even with restrictions, it still maintained its non-exclusive use). The Fourth Circuit's E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship is also instructive. *See* E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175 (4th Cir. 2000). Tenant Eastern Shore Markets, Inc. alleged that its lease with J.D. Associates, the shopping center landlord, promised that the landlord would manage the common parking lot as to benefit the store, and which would not deny their customers reasonable access to the store. Id. at 180. The tenant alleged that J.D. Associates breached this promise by: (1) allowing the east entrance of the shopping center's parking lot be blocked by another tenant's construction; (2) allowing construction vehicles to park in front of its store during the construction of a new tenant; and (3) reconfiguring the parking lot to benefit the new tenant. Id. at 181. In upholding the lower court, the Fourth Circuit stated that the lease gave the landlord "broad discretion over the management and control of the parking lot and that J.D. Associates' actions in temporarily blocking access to the store and blocking customers' view of Eastern Shore's store fall within

this conferred discretion." Id.; *See also* Hess's Dep't Stores, Inc. v. Ernest W. Hahn, Inc., 901 F.2d 552, 554 (6th Cir. 1990).

The instant case is almost identical. Under the Agreement, specifically under Sections 5.1 and 5.2, PCM could alter the common areas without affecting any essential obligation of the Agreement. (Docket No. 35-2 at 7). Section 5.1 of the Agreement explicitly states that common areas "**shall at all times be subject to the exclusive control and management of the landlord**" and that "Landlord shall have the right from time to time to: change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas." (Fact ¶ 15). Likewise, Section 5.2, which is also uncontroverted, provides that the "**Landlord may at any time close temporarily any common areas to make repairs or changes**." (Fact ¶ 16). Further, there is no evidence on record that Jackie's was prevented from using or accessing the leased Premises. Instead, the only reason Jackie's gave to justify resolution of the Agreement was Ms. Yu Ye's assertion that the mall was taking too long in notifying her when the Mall would be open to the public. (Docket No. 35-24 at 76-77). She further averred that "if the mall doesn't restore back to normal, with like the amount of people back to open to the public, she can't do business or she can't open up." Id. at 77.

Notably, while PCM did undertake renovations to the common areas after the passing of Hurricanes Irma and María, the leased Premises occupied by Jackie's suffered no physical damages, a fact which Plaintiff's manager admitted during her Deposition. (Fact ¶ 31; Docket No. 35-24 at 78).[11] Moreover, there were other restaurants open in the Food Court by the time Jackie's was available to physically open on December 1, 2017 and while the Mall was undergoing repairs. (Facts ¶¶ 33 and 37). Jackie's managing member even admitted during the Deposition that she was unaware as to how her situation differed from that of other businesses in the Mall's Food Court which were open by early December. (Docket No. 35-24 at 77-78). Moreover, PCM abated Jackie's rent from the date of Hurricane María though December 1, 2017. (Fact ¶ 71).

Third, the Court understands that Jackie's abandoned the Premises and therefore breached its agreement with PCM. As expected, there is a significant back and forth in the record concerning whether Jackie's abandoned the Premises. For example, PCM's Facts Nos. 27, 29 and 41 (collected herein under Fact ¶ 78) reference how Plaintiff abandoned or vacated the leased premises or ceased operations within it. (Docket No. 34-2 ¶¶ 27, 29 and 41). Plaintiff's responses to those facts deny the same. Id. All

---

[11] Both Jackie's and PCM filed as exhibits to their MSJs identical copies of Ms. Yu Ye's June 27, 2018 Deposition. (Docket Nos. 34-11; 35-24). Subsequent references to the same will only cite Docket No. 35-24.

three responses explain that Jackie's was only executing its right
"to rescind [resolve] the Lease Agreement, by providing
termination notice […] due to Plaza Carolina's nonperformance of
its essential duties under the Agreement" because of "the
supervening impossibility caused by the damages sustained as a
result of Hurricane Maria." Id.

However, Plaintiff's response to Fact ¶ 78 (PCM's SMUF Fact
No. 41) regarding its ceased operations includes the admission
that "the last day it did business was September 18, 2017." (Docket
No. 36-1 at 26). Further, Ms. Yu Ye's Deposition supports a finding
that Jackie's abandoned the Premises. (Fact ¶ 80). The Court notes
that Plaintiff, thorough its General Manager Ms. Yu Ye, answered
therein the affirmative "yeah" to questions from Defendant's
counsel during the Deposition regarding if Plaintiff had left the
Premises. Id. Moreover, this occurred after Plaintiff stated
during its Deposition that "**[s]he [Jackie's] doesn't want to do it
anymore. […] She doesn't want to work anymore. She doesn't want to
go with the lease.**" Id. (emphasis added).

The Court thus finds that Plaintiff intended to abandon the
Premises when it failed reopen for business on December 1, 2017
and failed to pay rent thereafter. "[A]bandonment of a leasehold
in Puerto Rico, as elsewhere, requires both the act and intention
of relinquishing the premises absolutely." Cruz v. Molina, 788 F.
Supp. 122, 127 (D.P.R. 1992); see also ABANDON, Black's Law

Dictionary (11th ed. 2019) (defining "abandon" as "[t]o relinquish
or give up with the intention of never again reclaiming one's
rights or interest in" or "[t]o desert or go away from
permanently"). As Ms. Yu Ye's Deposition testimony shows, Jackie's
failure to reopen in December 2017, was with the intention of
permanently relinquishing the Premises, even if it was in the
process of removing the equipment left in the same.[12] *Cf*. <u>Cruz</u>, 788
F. Supp. at 127 ("Plaintiff's and David Loperena's testimony and
the presence of a significant quantity of Plaintiff's belongings
in the house make clear that on January 27 Plaintiff had not
abandoned the leased premises, for he had not intended at that
point to relinquish the premises absolutely").

     It is evident from Ms. Yu Ye's testimony that Jackie's
abandoned the Premises because it was no "longer interested or
because the contract [did] not suit [it] anymore." <u>Dopp</u>, 38 F.3d
at 1246. Given that it stopped paying monthly rent after September
2017, Jackie's defaulted under the Lease per Section 18.1. This
Section reads: "The following shall be considered for all purposes
to be defaults under and breaches of this Lease: **(a) any failure
of Tenant to pay any rent or other amount when due hereunder,** […]
**(f) if Tenant abandons or vacates or does not do business in the**

---

[12] Ms. Yu Ye's Deposition also stated that after the Hurricanes she moved to New
York and at the time of the Deposition, she was living in Brooklyn. (Docket No.
35-24 at 10, 13-14). In the *Opposition to Motion to Strike*, Plaintiff clarified
that she moved back to Puerto Rico on October 15, 2018. (Docket No. 45 at 5).

**Premises**." (Fact ¶ 75). Further, because of Plaintiff's breach and due to Defendant taking action against it because of said breach, Section 18.2 allows Defendant to recover all damages including "**the cost of recovering the Premises, brokerage fees and expenses of placing the Premises in rentable condition, [and] attorneys' fees**." (Fact ¶¶ 76). It may also recover "**the difference between the Minimum Rent and all items of additional rents reserved hereunder for the period which otherwise would have constituted the balance of the Lease Term and the then present rental value of the Premises**." Id. Moreover, Jackie's is **not** entitled to the return of its security deposit of $43,160 pursuant to Section 15.1 of the Lease. (Facts ¶¶ 19 and 25). Jackie's must pay the damages mentioned above and the portion of rent owed from December 2017 until November 22, 2022 when the Agreement was supposed to expire.[13]

The Court finds that the non-exclusive right to use the common areas was **not** an essential obligation agreed upon by the parties under the September 4, 2012 Agreement. Further, Plaintiff failed to allege that Defendant limited its access to the Premises, therefore Article 1077 is inapplicable to the present case. As Article 1077 does not justify resolving the September 4, 2012

---

[13] The Court notes that Jackie's paid the full September 2017 rent (Fact ¶¶ 25-26) and that PCM abated tenants' rents from the passing of Hurricane María until December 2017. (Fact ¶ 71). The unused $3,204.60 rent that Jackie's paid in full for September 2017 (Fact ¶ 55) and the $43,160 security deposit (Fact ¶ 25) shall be credited to the amount owed to PCM.

Agreement, Defendant is not liable for any resulting damages claimed by Jackie's. *See* P.R. Laws Ann. tit. 31, § 3052. Defendant's breach of contract claim in its *Motion for Summary Judgment* (Docket No. 34) is **GRANTED** whereas Plaintiff's contract resolution claim in its *Motion for Summary Judgment* (Docket No. 35) is **DENIED**.

**B. Contractual Right to Restaurant Equipment**

As evidenced by the record, the parties communicated regarding the retrieval of the equipment Plaintiff claims is its personal property and how PCM forbade its removal from the leased Premises. (Facts ¶¶ 57-65). In November 2017, PCM's attorney Mr. Wade J. Hornbacher, Esq. sent an email to Jackie's reiterating the prohibition of the removal of the restaurant equipment per Section 10.2 of the Agreement. (Facts ¶¶ 59 and 63). This section states in part that "all alterations, changes and additions and all improvements […] made by Tenant […] shall immediately upon installation attached to the fee and become Landlord's property and shall not be removed unless replaced by like property." (Fact ¶ 59). Further, "[i]f Tenant fails to remove any shelving, decorations, equipment, trade fixtures or personal property from the Premises prior to the end of the Lease Term, they shall become Landlord's property." Id.

Further, in its Counterclaim and in its MSJ, PCM claims that it has a proprietary interest in the restaurant equipment left

behind when Jackie's abandoned the Premises. (Docket No. 34-1 at 27-28). PCM avers that Jackie's is bound to the agreement even if its owners did not read the agreement and instead had it summarized by a third-party. Id. at 27. PCM also alleges that Section 20.2 of the Lease (Fact ¶ 68) grants it a contractual lien over the equipment and any assets that remain in the Premises if Plaintiff defaults on the Lease. Id. at 28. PCM echoed this in its reply to Plaintiff's opposition to its MSJ and in its opposition to Plaintiff's MSJ. (Docket Nos. 39 at 20-21; 42 at 9).

On the other hand, Jackie's argues that Section 10.2 does not include the restaurant equipment or any of its personal property because it only applies to assets which were "attached" to the real property, which its equipment was not. (Docket No. 35 at 21). It also posits that the requirement that the equipment be removed "'prior to end of the Lease Term' is not met because the 10-year term of the Lease had not expired yet." Id. Therefore, PCM's construction of Section 10.2 is unreasonable. Id.

Jackie's also alleges that PCM cannot use Section 20.2 to enforce its supposed security interest over the equipment because the security interest was never perfected given that PCM failed to file a financing statement as required by Section 9-312(a) of the Chapter 9-Secured Transactions, P.R. Laws Ann. tit. 19, § 2321(a)(3) and § 2262(a). Id. at 22. Section 20.2 had authorized PCM to prepare and file financing statements signed **"only by**

**Landlord (as secured party) covering the security described above.**"
(Fact ¶ 68). Said Section also explained that "[u]pon any default
under this Lease […] any or all of Tenant's obligations to Landlord
secured hereby shall, […] be immediately due and payable without
notice or demand." Id. Lastly, Jackie's contends that in not letting
it remove its equipment, PCM illegally seized the same. (Docket No.
35 at 22-23). This resulted in a loss of income, valued at $14,000,
for the sale of the equipment. Id. at 23. *See* Docket No. 45-2 at
33-36 for offers to buy equipment. Plaintiff reiterated this in its
opposition to PCM's MSJ. (Docket No. 36).

The Court agrees with Jackie's that it did not lose its right
to the equipment when it left the Premises. While the Court herein
concluded that Jackie's abandoned the Premises and breached the
lease, the Court also notes that **PCM never perfected its security
interest over Plaintiff's property**. As Jackie's highlighted in its
MSJ, PCM admitted that it did not file a financing statement securing
its interest over the property. (Facts ¶¶ 68-70).

Section 9-203 of the Puerto Rico Commercial Transactions Act
(UCC-PR) states that "a security interest attaches to the
collateral when it becomes enforceable against the debtor with
respect to the collateral." P.R. LAWS ANN. tit. 19, § 2233(a).
Moreover, a creditor's security interest attaches to the debtor's
collateral only if "(1) value has been given [to the collateral];
[and] (2) the debtor has rights in the collateral or the power to

transfer rights in the collateral to a secured party." Id. §
2233(b). Also, at least one of the following conditions must be
met: (1) "The debtor has authenticated a security agreement that
provides a description of the collateral"; (2) "the collateral is
not a certificated security and is in the possession of the secured
party"; (3) "the collateral is a certificated security in
registered form and the security certificate has been delivered to
the secured party;" or (4) "the collateral is deposit accounts,
electronic chattel paper, investment property, or letter-of-credit
rights, or a life insurance policy, and the secured party has
control [over it]." Notably, "if the secured party wishes to
perfect his interest in the collateral, it must file
a financing statement with the Puerto Rico Secretary of
State." Prestige Capital Corp. v. Pipeliners of Puerto Rico, Inc.,
2011 WL 4899968, at *5 (D.P.R. 2011) (citation omitted).

    Here, PCM did not file a financing statement with the Puerto
Rico Secretary of State. Nor did it provide any evidence that its
security interest attached to the collateral or that it perfected
that interest over the equipment in a manner permitted by the UCC-
PR. See P.R. LAWS ANN. tit. 19, §§ 2233, 2262. The Court notes
that PCM failed to reply to Jackie's argument that it did not file
a financing statement over the equipment. As such, PCM lost any
potential security interest or contractual right over the
restaurant equipment. Defendant must return the restaurant

equipment to Jackie's after the issuance of this Opinion and Order. As a result, Plaintiff's claim regarding the equipment in its *Motion for Summary Judgment* (Docket No. 35) is **GRANTED.** Defendant's claim alleging a contractual right to the restaurant equipment in its *Motion for Summary Judgment* (Docket No. 34) is **DENIED**.

## IV.   CONCLUSION

Jackie's Restaurant, LLC did not have legally sufficient cause to terminate the Lease Agreement executed on September 4, 2012 with Plaza Carolina Mall, L.P. prior to its expiration date. The Court **GRANTS** Defendant Plaza Carolina Mall L.P.'s breach of contract claim in its *Motion for Summary Judgment* (Docket No. 34) and **DENIES** the breach of contract claim in Plaintiff Jackie's Restaurant, LLC's *Motion for Summary Judgment* (Docket No. 35). Furthermore, Defendant Plaza Carolina Mall L.P. cannot keep Jackie's equipment because it lacks a perfected security interest over the same. Thus, the Court **DENIES** Defendant's contractual claim over the restaurant equipment in its *Motion for Summary Judgment* (Docket No. 34) whereas it **GRANTS** Plaintiff's claim over the equipment in its *Motion for Summary Judgment* (Docket No. 35). For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** the *Motion for Summary Judgment* at Docket No. 34 and **GRANTS in part** and **DENIES in part** the *Motion for Summary Judgment* at Docket No. 35. Consequently, **all** of Plaintiff's claims are **DISMISSED WITH PREJUDICE** except for claims regarding damages arising from Plaza

Carolina Mall L.P.'s retention of the restaurant equipment. Judgment shall be entered accordingly upon trial on the issues identified above.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of June 2020.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge